12678

SIMON v. ÆTNA CASUALTY & SURETY CO.

(148 S. E., 648)

46

*Messrs. Mann & Plyler,* for appellant,

*Messrs. Dakyns B. Stover,* and *Deàn & Wyche,* for respondent,

June 12, 1929.

The opinion of the Court was delivered by MR. JUSTICE STABLER.

This is an action for damages, and arises out of default on a building contract entered into between the plaintiff, Simon, as owner of the building, and J. Archie Willis & Co., as contractor; the defendant, Ætna Casualty & Insurance Company, having the contract to indemnify the owner against loss. Suit was commenced on October 2, 1926, against both the contractor and the surety company.

The complaint alleges that, on August 4, 1925, Willis & Co. contracted to erect for the plaintiff, for a consideration of $32,000, a two-story salesroom, shop, and storage building, in the City of Greenville, according to plans, specifications, and drawings referred to in the contract; that thereafter, August 21, 1925, the defendant, Ætna Casualty & Insurance Company, in consideration of a cash premium of $480, executed and delivered to the plaintiff its bond and insurance policy, in writing, whereby it agreed to indemnify the plaintiff in the sum of $32,000, against any and all loss directly arising by reason of the failure of J. Archie Willis & Co. to faithfully perform its agreement; that up to the time of the default, the contractor had failed to perform its work, in many instances and in numerous particulars, in a skillful and workmanlike manner and in accordance with the plans and specifications; that on January 2, 1926, the contractor abandoned the contract and ceased to perform any work on the building or to carry out the provisions of its agreement; that such default resulted in mechanic's liens being filed against the property, to plaintiff's loss and dam-

age; that the surety company was immediately notified of the default, but it did not elect to assume completion of the abandoned contract, and the plaintiff himself was compelled to do so at an excess cost over the contract price. He asked for $30,000 damages.

The contractor, Willis & Co., made no answer to the complaint. The surety company interposed a general denial, and pleaded that plaintiff had violated the terms of the bond in failing to retain 10 per cent., as required by its provisions, of the value of all work and materials furnished on the job in making payments on the contract price, and in making payments on account of the contract in advance of the progress of the work, and in advancing to the contractor on the contract price several thousand dollars not supported by any claim for materials; that he had ordered many expensive changes in the building, and failed and neglected to let the subcontracts direct to the subcontractors; and that in completing the building he had done so at an unnecessarily great expense, making many alterations and additions not allowed under the terms of the contract.

The case was tried at Greenville, before Judge Mauldin and a jury on June 22, 1927, and resulted in a verdict for the plaintiff in the sum of $21,480.32. At the proper time during the trial of the case, the surety company made a motion, on numerous grounds, for a directed verdict, which was refused by the Court. A motion for a new trial, heard some time after the case was tried, was also overruled by the Court. The surety company now appeals to this Court, alleging that Judge Mauldin committed numerous errors— in the trial of the case, and in refusing the motions for a directed verdict and for a new trial.

The exceptions are 20 in number. In our discussion, however, we shall group them wherever that may be done, following, in the main, the plan adopted by the respondent in his argument.

We shall group and consider, first, exceptions 1, 2, 3, and 5, which allege error on the part of the trial Court in refusing to direct a verdict for the defendant: (1) Because the plaintiff materially altered and varied the contract to the injury of the surety, in that (a) he made payments to the contractor without requiring the architect's certificates as the basis of same, and (b) he failed to let subcontracts direct to the subcontractors; (2) because the plaintiff violated the express terms and provisions of the bond, in that (a) in making payments on the contract price, he failed to retain, as required by the bond, 10 per cent. of the value of all work and materials furnished on the job, and (b) he made alterations and additions in erecting the building, which increased the cost to complete it more than 20 per cent., without the written consent of the surety; (3) because the plaintiff made excessive payments to the contractor prior to default, in that (a) he made payments in advance of the progress of the work, and (b) he advanced large sums of money to or for the benefit of the contractor which had not been earned under the terms of the contract; and (5) because the provisions for the financing of the contract, as well as those relating to the prosecution of the work, were materially altered and disregarded by the plaintiff.

We have given much time and study to the voluminous record in this case. Our careful examination of the testimony leads to the conclusion that the conflicting evidence, as to subdivision (b) of exception (2), as to subdivisions (a) and (b) of exception (3), and as to exception (5), required the submission to the jury of the questions here involved, as to whether or not the plaintiff had violated the provisions of the contract and the terms of the bond in the particulars specified. As to subdivisions (a) and (b) of exception (1), it was admitted by the plaintiff and the architect that payments were made to the contractors without the architect's certificates as required by the contract, and that the subcontracts were not let direct by the plaintiff to sub-

contractors as the contract required, and as to subdivision (a) of exception (2), Simon himself testified that "there was no effort to retain any 10%." From this testimony and these admissions, it is clear that the contract was violated in such particulars; and unless it appeared that the bonding company suffered no injury thereby, or that it waived the forfeiture thus created, a verdict for the defendant should have been directed by the trial Court.

As to whether there was waiver by the defendant bonding company of the forfeiture of the bond by the respondent, the testimony is in sharp conflict; and we think that this question, in view of the evidence adduced, was properly submitted to the jury. There was testimony tending to show that the bonding company, through its agents, after knowledge of the alleged forfeiture of the bond by the respondent, did certain things from which a waiver on its part of such forfeiture might be reasonably inferred by the jury. The trial Judge properly refused the motion to direct a verdict on the grounds set out in these exceptions.

In its motion for a directed verdict the appellant relied also on the following ground: "That the reasonable and necessary cost of completing the building in accordance with the contract, plans and specifications did not exceed the balance due on the contract price after allowing proper credit for the amount that plaintiff should have retained, advances improperly made and the cost of extras."

The motion on this ground was refused, and the appellant brings error by its fourth exception. We do not think there was error. The testimony on this point was conflicting, was susceptible of more than one inference, and made a question of fact for the jury.

The sixth exception imputes error to the trial Judge in admitting in evidence a letter of Ben H. Wiseberg to the respondent, dated August 11, 1925; the specifications of error being that: (a) The letter was written prior to the execution of the bond and by one who was not an agent of the

defendant, but was, on the contrary, the agent of the plaintiff; and (b) the letter varies or alters the terms of the bond, which was executed ten days later and the terms of which are clear and unambiguous.

It appears that the respondent wrote to his uncle, Ben H. Wiseberg, of Atlanta, Ga., with reference to procuring a bond covering the building contract. Wiseberg's reply is the letter objected to.

As to specification (a), the appellant contends that Wiseberg was merely a broker and was the respondent's agent, under the general principle that an insurance broker is the agent of the insured, and that the Wiseberg letter is merely a letter from an agent to his principal, citing 14 R. C. L., 868, in support of this position: "An insurance broker is one who acts as a middleman between the assured and the insurer, and who solicits insurance from the public under no employment from any special company, but having secured an order, he either places the insurance with a company selected by the assured, or in the absence of any selection by him, then with a company selected by such broker. A broker is the agent for the insured, according to all authorities on the subject, though at the same time for some purposes he may be the agent for the insurer, and his acts and representations within the scope of his authority as such agent are binding on the insured." See, also 4 R. C. L., 242, 256.

The respondent, in answer to this objection, contends that under the law of this State Wiseberg was the agent of the surety company, citing Section 4089, Vol. 3, 1922 Civil Code, as follows: "Any person who solicits insurance in behalf of any insurance company not organized under or incorporated by the laws of this State, or who takes or transmits other than for himself any application for insurance or any policy of insurance to or from such company, or who advertises or otherwise gives notice that he will receive or transmit the same, or who shall receive or deliver a policy

of insurance of any such company, or who shall examine or inspect any risk, or receive, collect, or transmit any premium of insurance, or make or forward any diagram of any building or buildings, or do or perform any other act or thing in the making or the consummating of any contract of insurance for or with any such company, other than for himself, or who shall examine into and adjust, or aid in adjusting, any loss for or in behalf of any such insurance company, whether any such acts shall be done at the instance or request or by the employment of such insurance company, or not, shall be held to be acting as the agent of the company for which this act is done or the risk is taken."

The respondent also cites, as construing this statute, *Rabb v. New York Life Insurance Co.,* 108 S. C., 137, 93 S. E., 711, and *Norris v. Hartford Fire Insurance Co.,* 57 S. C., 358, 35 S. E., 572.

The appellant in reply maintains that Section 4089 is operative only "in the event a person acting for a foreign company is a resident of South Carolina," and is, therefore, not applicable in the present case, and maintains that the cases cited by respondent support its position, quoting from the *Norris case* as follows: "This insurance company must remember that its contracts made *within our State limits,* under our statute, are taken with Section 1481 [Rev. St.] [now 4089], hereinbefore quoted, as a part of such contracts." (Italics added.)

In this connection it may be well to call attention to the words of the Court in the *Rabb case* also: "Plainly, one of the purposes of the act was to regulate insurance agents, by requiring them to be licensed, and by subjecting them to penalties for violations of the insurance laws and to prevent evasion thereof by the agents saying they were acting as agents of the insured and not of the insurance companies. If the statute had not defined who should be held to be agents of insurance companies, as it did, *any person in the State* might have solicited insurance for a foreign com-

pany not licensed to do business here, or for one whose license had been revoked, without himself having a license as an insurance agent, and without subjecting himself to liability for violation of the insurance laws, by simply proving that he was acting as agent of the insured and not of the insurer." (Italics added.)

It ·may appear, by implication at least, that the *Norris* and *Rabb cases* support the appellant's contention. However, in *Maryland Casualty Co. v. Gaffney Manufacturing Co.,* 93 S. C., 406; 76 S. E., 1089, which was not cited by either the appellant or the respondent, where an insurance agent, Brem, who lived in Charlotte, N. C., was unable to procure a policy for the defendant in · his own company, but "brokered" it to the general agent of the plaintiff, who wrote the policy and sent it to the defendant through Brem, it was held that Brem was the plaintiff's agent and his knowledge was imputed to the plaintiff. In that case the matter of. agency was not presented in the exact form in which it is presented in the present case, but a decision as to Brem's agency was just as necessary in order to determine the questions involved.

The language of the Court in the *Norris case* and the *Rabb case,* which appellant contends indicates that Section 4089 applies only to persons living in the State, was not used to decide the point at issue in the present case, but was broad enough to cover the facts in those cases, since the persons whose agency was brought into question were residents of this State, and the references to persons "in the State," etc., were merely incidental. It· is true also that in the *Gaffney case* the question of the applicability of Section 4089 to a transaction in which the agent procuring the insurance resides outside of the State was not raised in the same manner as in the present case, but still it was necessary in that case for the Court to decide whether the broker was the agent of the insurance company before it could decide whether knowledge that he had would be imputed to the

company. It seems, therefore, that the *Gaffney case* strongly supports the respondent's position in the present case. We think that the provisions of the Section apply to persons therein referred to, whether living within or without the State. Otherwise, it would be a matter of little difficulty for any insurance company to avoid liability for the acts of its agents, adjusters, etc., by simply having them live in an adjoining State while carrying on business in this State, thus defeating the evident purpose of the statute.

The appellant takes the further position that any agency under Section 4089 is merely a presumption and subject to rebuttal, and that even if it should be held that this Section is applicable to Wiseberg in the present case, the evidence clearly rebuts any such presumption and shows that he was acting for Simon, who admitted that he put Wiseberg in action to procure the bond for him in Atlanta, Ga. In support of this position, the following from *Madden & Co. v. Phœnix Insurance Co.,* 70 S. C., 295, 49 S. E., 855, is cited: "When a person does any of the acts enumerated in [Civ. Code 1902] Sec. 1810 [now 4089] of the Code of Laws, the presumption is that he was the agent of the insurance company, but such presumption is subject to rebuttal."

But immediately following the Court uses this language: "This principle does not infringe upon the doctrine announced in *Young v. Ins. Co.,* 68 S. C., 387 [47 S. E., 681]. Our conclusion is that the acts and declarations of the agents, J. W. Spence and F. M. Butt, were *prima facie* binding upon the defendant, and that they furnished evidence of waiver on the part of the defendant to insist upon its right to require compliance with the terms of the policy as to proofs of loss, especially when F. M. Butt refused to assist in the preparation of the proofs of loss, and declared that the policy was null and void from the time it was issued. These facts tended to show a denial of liability on the part of the defendant, and that it intended to rely upon the fact of forfeiture

of the policy by the plaintiffs as a ground for refusing payment."

The appellant's quotation from the *Madden case* taken alone indicates, as contended, that agency under Section 4089 (formerly Section 1810 [Civ. Code 1902]) is a matter of presumption and subject to rebuttal. A continuation of the reading from the opinion as just quoted indicates, however, that the real point in the Court's mind was that the acts and declarations of the agents, Spence and Butt, would not *conclusively* show waiver, but were *"prima facie* binding upon the defendant," rather than that Spence and Butt were only *prima facie* or presumptive agents of the defendant. It will be noted that after making the statement that "such presumption is subject to rebuttal," the Court, too, referred to Spence and Butt as "the agents" and not the *"prima facie* or presumptive agents."

This view, it seems to us, is a much more tenable one than the position that the agency itself under Section 4089 is merely presumptive and subject to rebuttal, for the latter does not appear consistent with the statute. The statute does not say that, "Any person who solicits insurance * * * shall be presumptively held to be acting as the agent of the company," but says, clearly and plainly, without modification: "Any person who solicits insurance * * * shall be held to be acting as the agent of the company," etc. To interpolate the word "presumptively" into the statute would be for the Courts to assume the prerogative of the Legislature.

The admission of the letter in evidence was not objectionable, therefore, on the ground stated in subdivision (a) of this exception.

As to subdivision (b): Even though Wiseberg was the agent of the surety company, the question still remains whether the letter should have been admitted, objection having been made on the ground that it varied the terms of the bond, which was subsequently executed. The letter was not

made a part of the bond by reference; it was only a part of the negotiations leading up to the execution of the bond. Was it admissible as such?

The general rule that the terms of a written instrument cannot be varied by parol testimony applies to negotiations leading up to the execution of the instrument. In *Bruce v. Moon*, 57 S. C., 60, 35 S. E., 415, this Court said: "There can be no doubt that the rule is that the terms of a written instrument cannot be contradicted or even varied by parol testimony, and we may also concede that where parties, after verbal negotiations, enter into a written contract, such writing must, as a general rule, be regarded as expressing all the terms of such agreement. But still we think that the parol testimony in this case, in so far as it did not contradict or vary the terms of the writing —the will—was competent."

In *Colvin v. Oil Co.*, 66 S. C., 61, 44 S. E., 380, the Court said: "Parol testimony is competent to show the negotiations between the parties leading up to the execution of a written contract, provided it does not contradict or vary the terms of the written contract. *Bruce v. Moon*, 57 S. C., 60, 35 S. E., 415." And again: "We do not see that this testimony altered, varied or contradicted the written contract. It merely showed the circumstances and negotiations which led to the contract and consistent therewith, falling within the rule stated in *Bruce v. Moon, supra.*"

In 22 C. J., 1097, we find: "The execution of a bond merges all prior agreements or understandings with reference to the subject matter, and the instrument is not subject to be varied or contradicted, as to either its terms or conditions, by parol or extrinsic evidence."

The question then remains whether the letter varied the provisions of the bond. The appellant contends that the practical operation of the bond described in the letter would be different from that of the bond actually entered into, and that there was therefore variance to the prejudice of the

surety. The letter says: "Your letter of yesterday to hand and thank you for the inquiry. Have just returned from our casualty department, bond section, and find that the premium on a bond of this description is 1½% of the contract price irrespective of the amount of the bond that you want. In other words, the premium on this bond will be $480.00 even though you want only $8,000.00. In consideration of this rule of underwriting bonds, you might just as well have the full coverage. Suppose, for instance, that you have only $8,000.00 on this contract— your contract (contractor) starts your building and completes $10,000.00 of the work and dies or goes into bankruptcy or some other contingency comes up whereby the contract cannot be filled, if the bonding company is on the risk for only $8,000.00, then with the ten thousand the contractor has done and the $8,000.00 from the bonding company will total $18,000.00 and in order to finish the contract you will be out $14,000.00, whereas by getting a bond for the full amount, which you will have to pay for anyway under the underwriting rules, if the contractor falls down after completing $10,000.00 work, then the bonding company will step in for the balance."

In admitting the letter in evidence the Court said: "Well, I think that letter is competent here to explain what the parties had in mind for the Court itself to construe that contract. I think it is relevant on that issue, because the Court is, in its last analysis, bound to construe a written contract. Now, there may be things that the Court don't know and very often is and there is one of them. Go ahead."

At the trial, the appellant admitted the execution of the bond and it was placed in evidence. It was free from ambiguity and required no extraneous explanation. The only effect of the admission of the letter was to convey to the minds of the jury the measure of the surety's liability in case of default by the contractor, which measure,

according to the letter, was the entire amount of the work remaining unfinished when the default was made. The measure of the surety's liability under the terms of the bond, in case of the contractor's default, was the sum in excess of the contract price of $32,000 that would be reasonably necessary to complete the building according to the terms of the contract. It is clear, therefore, that the letter varied the terms of the bond, and its admission was error. This exception is sustained on this ground.

By exception 7, the trial Judge is charged with error in admitting in evidence a letter from the contractor to the owner, dated July 23, 1925, outlining terms of the proposed building contract. The portion of the letter patricularly objected to is the fourth paragraph, as follows: "We will turn over to you all bills and payroll accounts, and you shall pay these and take your discounts as compensation for furnishing the money with which to pay for the material and labor as the construction progresses, or we will pay for the material, taking the discounts, and furnish the payroll, and on each payment date, after deducting our interest charge, we will split with you 50-50, the discount money received." The appellant contends that this paragraph varies or alters the terms of Article 7 of the contract, entered into on August 4, 1925, providing that the owner should pay direct certain costs for materials, supplies, and equipment.

What we have said in our discussion of subdivision ▪ (b) of exception 6 is applicable here. The letter, clearly a part of the negotiations leading up to the consummation of the contract, was admitted in evidence on the theory that it would enable the Court to understand what the parties, in making the agreement, had in mind. As the terms of the contract are clear and unambiguous, the admission of the letter for that purpose was unnecessary; the only effect of its admission was to vary the terms of the contract in the respects specified. This exception is sustained.

The appellant, by exceptions 8, 9, 10, and 11, complains of error in the admission of certain evidence intended to prove damages to respondent as a result of mechanic's liens filed against the property for labor and materials after the contractor's default. The respondent contends that these liens were filed because the contractor failed to perform his contract, that he was damaged as a direct result of such breach, and that the surety company is liable therefor.

By the provisions of the contract, the owner himself was required to pay direct for "materials, supplies, equipment and transportation required for the proper execution of the work which shall include all temporary structures and their maintenance * * *" and also "the amounts of all separate contracts."

Under his own testimony that such payments were not made direct, but to the contractor, the filing of the mechanic's liens must be attributed to his own disregard of the terms of the contract; and if he suffered any injury through the filing of such liens, the surety company is in no way liable therefor.

But while the admission of the testimony was error, we think that such error was cured, or rendered harmless by instructions given to the jury by the Court at the appellant's request. By these instructions, positive and direct, the Court in effect told the jury that they should disregard, in their consideration of the question of damages, any testimony as to mechanic's liens:

"I charge you that the defendant, J. Archie Willis & Company, was an independent contractor and that any claims for mechanic's liens against the plaintiff are not chargeable against the surety on the contractor's bond."

"I charge you that the defendant, J. Archie Willis & Company, was an independent contractor and that any bills for labor and materials incurred by him did not constitute

legal claims against H. H. Simon and cannot in any event be charged against the defendant surety company."

"Since the defendant, J. Archie Willis & Company, was an independent contractor and the owner therefore was not liable for his obligations, although materialmen may have filed mechanics' liens against the plaintiff on account of unpaid bills by J. Archie Willis & Company, I charge you that any inconvenience or loss by way of interest or otherwise occasioned to the plaintiff by reason of such liens or claims cannot be charged against the defendant surety company."

By its twelfth exception, the appellant charges the trial Judge with error in admitting, as evidence of the amount of respondent's damages, testimony as to the sum expended by him in completing the building, in that the correct measure of damages was the reasonably necessary costs of completing the work, and not the sum actually spent by the respondent.

Under the decision in *Feaster v. Cotton Mills,* 51 S. C., 143, 28 S. E., 301, testimony of what Simon actually expended in the completion of the building was not admissible "as independent evidence of what the work should reasonably have cost," that is to say, standing alone, it would not be admissible for that purpose; but it was admissible if other and competent testimony was adduced, showing or tending to show that such alleged expenditure was the reasonably necessary cost. The record discloses that there was some competent evidence tending to show this to be true. Hence, the testimony objected to was admissible, and, with all other competent evidence bearing upon the issue, was properly submitted to the jury for their determination of the question involved.

By exception 12, error is imputed to the trial Court in admitting the testimony of respondent's witness Barksdale, as to defective workmanship in the building and as to the amount of damages by reason thereof, upon the ground that

the witness did not properly qualify as an expert, and that his testimony was also inadmissible as hearsay.

We are convinced, from an examination of Barksdale's testimony and the rulings of the Court on the appellant's objection thereto, that no error was committed. It appears that the witness had had sufficient experience in such matters to qualify as an expert, and that the Court ordered stricken from the record all such matters testified to by the witness as were objected to by appellant as hearsay.

By exceptions 14, 15, and 16, the trial Judge is charged with error in refusing to allow the witness B. M. Taylor, an agent of the appellant at Atlanta, Ga., to testify as to conversation between himself and Wiseberg, instructions given by him to Wiseberg, etc., regarding the bond ·for Simon. The appellant's contentions are: (a) That Wiseberg was Simon's agent, or at least the question of agency was for the jury, and therefore the conversation, instructions, etc., were admissible in evidence; and (b) that for the Court to say, as he did say, that Wiseberg was the representative of the surety company, was an expression of opinion on the facts, and so was a violation of the Constitution.

The question of Wiseberg's agency is the determining factor in passing upon these exceptions. What we have said in our discussion of subdivision (a) of exception (6) disposes of this question. As both Wiseberg and Taylor were agents of the appellant, any conversation between them would not be binding upon respondent, and testimony relating thereto was properly excluded.

By its seventeenth exception, the appellant complains of the following remarks made by the trial Judge in the presence of the jury, in passing upon its motion for a directed verdict: "I do not think contracts carry with them such lack of respect that people can go through the perfunctory act of entering into a contract unless they mean business by it; and when a bond is executed, the man that applies for that bond and secures it, he is doing for a pur-

pose and not for a pastime; and when an individual or when a concern which has for its business its issuance of a bond for a definite purpose, and issues a bond, I don't think technicalities should be fallen upon."

The appellant contends that the foregoing expressions were harmful because the reasonable conclusions of the jury would be that (a) the Court disapproved of the defenses interposed by the surety company; (b) the trial Judge believed that the surety company relied upon technicalities to defeat respondent's claim; and (c) these remarks of the Court were reasonably calculated to influence the jury in their decision.

We think that the appellant's position is sound. It is quite possible that the jury concluded from the Court's remarks —which, of course, were not so intended—that in his opinion the defenses interposed by the surety company were not substantial, but technical in their nature; and if the jury so concluded, it must have necessarily affected their consideration of the case, and to this extent the Court participated in their decision. See *Rainey v. Simon,* 139 S. C., 337, 138 S. E., 41; *Latimer v. Electric Co.,* 81 S. C., 379, 62 S. E., 438; *State v. Barfield,* 128 S. C., 384, 122 S. E., 856; *Lorick & Lowrance v. Walker & Co.,* 147 S. C., 178, 145 S. E., 33.

The trial Judge charged the respondent's fourth request, as follows: "In order for a bonding company to claim a forfeiture it must first return or offer to return the premium paid for the bond."

The appellant contends, by its eighteenth exception, that this charge was prejudicial to it, in that the proof supporting the defenses interposed by the surety company tended to show active violation of the terms of the bond and the contract, and that the foregoing charge as to forfeiture was inapplicable; and that, at most, the failure to return or to offer to return the premium to the owner was only evidence of waiver, a question to be passed on by the jury.

The law as to waiver of forfeiture through the failure to return the premium paid is the same in the case of a surety bond as in the case of an ordinary insurance contract. *State Agricultural & Mechanical Soc. of South Carolina v. Taylor,* 104 S. C., 167, 88 S. E., 372. And it is well settled that, in the absence of a provision in such contract having a contrary effect, the failure to return the premium paid does not constitute waiver as a matter of law, but is evidence of waiver for the consideration of the jury. *Norris v. Insurance Co.,* 57 S. C., 358, 35 S. E., 572; *Powell v. Insurance Co.,* 97 S. C., 375, 81 S. E., 654; *Scott v. Insurance Co.,* 102 S. C., 115, 86 S. E., 484. By the charge here complained of, the jury were told, in effect, that a failure to return or to offer to return a premium paid constitutes waiver of forfeiture as a matter of law. This took the question of waiver from the jury, and was error.

The Court charged the respondent's fifth request: "It may be asserted broadly that if in any negotiation or transaction with the obligee after knowledge of forfeiture the bonding company recognizes the continued validity of the bond or its acts based thereon or requires the obligee by virtue thereof to do some act or incur some trouble or expense, the forfeiture is as matter of law waived; and it is now settled in this Court after some difference of opinion that such waiver need not be based upon any new agreement or estoppel." Adding the following thereto: "That is correct. You will remember that the contention and the allegation of the complaint in this case is that upon the default the insurance company was notified thereof, but that the surety company declined to contend for the completion of the contract."

No objection is made to the correctness of the request as an abstract proposition of law, but the appellant, by its nineteenth exception, contends that when the request and what the Court added are considered together, the charge was misleading and reasonably calculated to convey to the minds

of the jury the conclusion that, because the surety company did not complete the building, the respondent had to do so, thus incurring "some trouble or expense," and that the bonding thereby waived any right to claim forfeiture.

The bond provided that: "In the event of any default, the Surety shall have the right at its option to proceed, or procure others to proceed, with the performance of such contract. * * *" After notice of the contractor's default, the surety declined to exercise this option.

While the additional charge of the Court was merely a statement of an allegation of the complaint, still, when made in connection with what had just been said, it may have conveyed—and probably did convey—to the minds of the jury the inference that expense or trouble incurred by the respondent in completing the building, on account of appellant's refusal to exercise its option, was such expense or trouble as would bring about waiver of forfeiture as defined in the requested portion of the charge.

Under the provisions of the bond, the mere failure of the surety company to exercise its option could not affect its right to claim forfeiture or deprive it of any of its defences. We think that when the two parts of the charge, the request and what was added by the Court, are taken together, the instruction was misleading and prejudicial.

By its twentieth exception, the appellant complains that the Court committed error in not granting a new trial or new trial *nisi* because the verdict of the jury was excessive.

The contention is that there was no competent evidence to support the *amount* of the verdict, and that it is far in excess of any amount to which respondent was entitled under any view of the evidence. In support of this contention, appellant's counsel submit a mathematical calculation, whereby they undertake to demonstrate that, if the respondent was entitled to recover at all, the testimony would not support a verdict for more than $8,832.72, with reasonable interest;

and that certainly, even if the testimony of the witness Barksdale were admissible, not more than $2,500 should be added, making a total of $11,332.72. Various reasons are suggested and argued as explanatory of the verdict, among them being that it was founded upon prejudice and caprice.

In reply to appellant's position, counsel for respondent also submit a mathematical formula, which, it is claimed, fully and satisfactorily explains the amount of the verdict.

Under the evidence admitted and considered by the jury in their determination of the question involved, we cannot say that the verdict was the result of caprice or prejudice. At any rate, as there must be a new trial, at which a different jury will pass upon the evidence, and as the testimony on the second trial will not be altogether the same as that on the first trial, the question raised by this exception becomes immaterial and academic.

The judgment of the Circuit Court is reversed, and the case remanded for a new trial.

MR. CHIEF JUSTICE WATTS and MESSRS. JUSTICES BLEASE and CARTER concur.

MR. JUSTICE COTHRAN (concurring and dissenting): I concur generally in the disposition of all of the exceptions other than 1, 3, and 5. As to them I concur with the statement of Mr. Justice Stabler: "From this testimony and these admissions, it is clear that the contract was violated in such particulars; and unless it appeared that the bonding company suffered no injury thereby, or that it waived the forfeiture thus created, a verdict for the defendant should have been directed by the trial Court."

The learned justice adds: "There was testimony tending to show that the bonding company, through its agents, after knowledge of the alleged forfeiture of the bond by the respondent, did certain things from which a waiver on its part of such forfeiture might be reasonably inferred by the jury"— and thus summarily overrules the exceptions raising the question of a directed verdict for the defendant.

I do not find in the evidence any testimony bearing upon this issue, except that an investigating agent of the bond company came to Greenville and went over the affairs of the default; and that after the default another agent counter-signed the policy. There is no evidence, so far as my ex-amination has extended, which tends to show that the bond company was notified of any of the circumstances which are held to have constituted a breach of the bond. As has been often held, waiver is the voluntary, *intentional*, relinquish-ment of a known right, which is express waiver; or it may follow from a course of dealing by which the insurer, *with knowledge of an act* which entitled him to claim a forfeiture, enters into negotiations with the insured which recognizes the continued validity of the policy and induces the insured to incur expense and trouble under the belief that his loss will be paid, which is implied waiver. *Whaley v. Ins. Co.*, 124 S. C., 173, 117 S. E., 209. I do not find evidence of such knowledge or of such conduct on the part of the in-sured in this case. The act of the countersigning after the default was an act in the interest of the insured *nunc pro tunc,* and would unquestionably, if the agent had the right to do so, operate as a waiver of the objection that it had not been countersigned before. There is certainly no evidence that the countersigning agent had notice of the avoiding cir-cumstances.

I think therefore that the motion for a directed verdict should have been granted.