582 S.E.2d 432

**REGIONS BANK, Respondent,**

**v.**

**Bobbie A. SCHMAUCH, Appellant.**

**Bobbie A. Schmauch, Appellant,**

**v.**

**MCA Skywatch Traffic Network, Inc., Martin, Coleman & Associates, Inc., Donald Joe Schmauch, Jr. and Debra Coleman Schmauch and Richard Furman, Defendants,**

**of whom Richard Furman is Respondent.**

No. 3651.

Court of Appeals of South Carolina.

Heard April 8, 2003.

Decided June 9, 2003.

650

652

654

Robert C. Childs, III and Laura W.H. Teer, both of Greenville; for Appellant.

Stephanie H. Burton and Elizabeth J. Brady, both of Greenville; for Respondents.

ANDERSON, J.:

Regions Bank brought suit against Bobbie A. Schmauch (Appellant) to collect amounts owed on two loans allegedly guaranteed by Appellant. Appellant filed an answer, counterclaim, and third-party complaint. Regions Bank and Richard Furman (collectively referred to as Respondents) both moved for summary judgment. Appellant also moved for summary judgment. The trial judge granted Respondents' motions and denied Appellant's motion for summary judgment. Appellant's motion to alter or amend was also denied. We affirm.

## FACTS/PROCEDURAL BACKGROUND

Appellant's son, Donald Joe Schmauch (Joe Schmauch), was owner of MCA Skywatch Traffic Network, Inc. (MCA) and Martin, Coleman & Associates, Inc. (Martin Coleman). Appellant provided financial support for Joe Schmauch's businesses on many occasions, including loaning him money and cosigning on loans. The businesses were established to pur-

chase helicopters and use them to provide air surveillance for local broadcast stations and power companies.

On February 15, 1996, Joe Schmauch obtained a loan (first loan) from Greenville National Bank [1] for $100,000.00 on behalf of Martin Coleman. Appellant accompanied Joe Schmauch to obtain the loan. A certificate of deposit (CD) owned by Appellant was listed as collateral for the loan. Richard Furman conducted the loan closing and executed the necessary paperwork. The note provided for payments to begin March 15, 1996 and the balance due on February 15, 1999. Appellant has admitted making payments on the loan when Joe Schmauch or Martin Coleman was unable to make the payments.

Martin Coleman received a second loan (second loan) for $40,000.00 from Regions Bank on May 30, 1996. Appellant signed a Guaranty Agreement on May 30, 1996. However, neither the borrower's name nor the liability section of the Guaranty was completed.

On July 17, 1996, Martin Coleman renewed the second loan and borrowed additional funds to bring the total to $60,000.00. A second Guaranty Agreement purports to bear Appellant's signature. The Guaranty provides for unlimited liability with regards to the loans given to Martin Coleman. While the July 17, 1996 Guaranty is completely filled out, it does not contain a reference to a specific loan number. It is simply matched to the loan by the date on the Guaranty.

The second loan was again renewed on September 12, 1996, and additional funds were borrowed bringing the total to $65,190.80. An additional Guaranty is in the possession of Regions Bank. While the Guaranty purports to bear Appellant's signature, she denied it is her signature. The second loan was renewed several more times, including December 4, 1996. The December Note indicates Appellant is the co-borrower. However, Furman admitted she was listed as the co-borrower in error. Appellant also made payments on the second loan.

On February 15, 1999, the balance remaining on the first loan became due. Martin Coleman did not make payment.

---

1. Regions Bank purchased Greenville National Bank.

Regions Banks liquidated the CD and applied the proceeds to the amount due on the loan. The proceeds left a balance due of $1,726.05. The second loan came due on June 7, 1999. The balance due on the second loan was $51,154.79. Payment by Appellant was refused, and Regions Bank brought the instant action.

Regions Bank brought this collection action against Appellant on September 3, 1999, seeking to recover the balances owed on the two loans to Martin Coleman. Appellant filed an amended answer in which she made a general denial and proffered numerous allegations including fraud, discharge, forgery, equitable estoppel, coercion, and failure to provide notice of default. She also counterclaimed alleging, among others, negligence, breach of fiduciary duty, conversion, and fraud. Moreover, she asserted a third-party claim against Furman for negligence, breach of fiduciary duty, conversion, and fraud, among other claims.[2]

Respondents moved for summary judgment on July 10, 2001. Appellant also moved for summary judgment. At the hearing on the motions, Appellant withdrew several of her defenses, counterclaims, and third-party claims. The trial judge granted Respondents' motions for summary judgment. The court found the loan documents were clear and there was a contract between Appellant and Regions Bank for Appellant to guarantee the loans. The court concluded Appellant breached the Guaranty contract and awarded Regions Bank damages of $62,924.52 plus interest until the judgment is paid. The judge decided there was no evidence of forgery, fraud, or equitable estoppel.

The court determined Respondents did not owe Appellant any duty of care, and therefore, there were no grounds upon which to find them negligent. The court determined that the relationship between Regions Bank and Appellant was that of creditor-debtor and not a fiduciary relationship. Summary judgment was awarded to Respondents on Appellant's claim of conversion because the court held she pledged the CD as collateral and had no right to possession at the time the CD was liquidated. Finally, the court ruled Appellant did not

---

2. Appellant also filed third-party causes of action against MCA, Martin Coleman, Joe Schmauch, and Debra Coleman Schmauch.

establish fraud on the part of Respondents. Appellant's motion to alter or amend the judgment was denied.

## ISSUES

I. Did the trial court err when it found Appellant pledged her CD as collateral and properly completed a Guaranty Agreement in granting summary judgment in favor of Regions Bank on its collection action?

II. Did the trial court err in granting summary judgment in favor of Respondents on Appellant's claim of fraud?

III. Did the trial court err in granting summary judgment in favor of Respondents on Appellant's claim of equitable estoppel?

IV. Did the trial court err in granting summary judgment in favor of Respondents on Appellant's claim of negligence?

V. Did the trial court err in granting summary judgment in favor of Respondents on Appellant's claim of breach of fiduciary duty?

VI. Did the trial court err in granting summary judgment in favor of Respondents on Appellant's claim of conversion?

## STANDARD OF REVIEW

A trial court should grant a motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), SCRCP; *see also Tupper v. Dorchester County*, 326 S.C. 318, 325, 487 S.E.2d 187, 191 (1997); *Wells v. City of Lynchburg*, 331 S.C. 296, 301, 501 S.E.2d 746, 749 (Ct.App.1998). In reviewing the grant of a summary judgment motion, this court applies the same standard which governs the trial court: summary judgment is proper when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), SCRCP; *Baughman v. Am. Tel. & Tel. Co.*, 306 S.C. 101, 114–15, 410 S.E.2d 537, 545 (1991). Under Rule 56(c), SCRCP, the party seeking summary judgment has the initial burden of demonstrating the absence of a genuine issue of material fact. *Trivelas v. South Carolina Dep't of Transp.*,

348 S.C. 125, 130, 558 S.E.2d 271, 273 (Ct.App.2001). Once the party moving for summary judgment meets the initial burden of showing an absence of evidentiary support for the opponent's case, the opponent cannot simply rest on mere allegations or denials contained in the pleadings. Rather, the nonmoving party must come forward with specific facts showing there is a genuine issue for trial. Rule 56(c), SCRCP; *SSI Med. Servs., Inc. v. Cox*, 301 S.C. 493, 497, 392 S.E.2d 789, 792 (1990); *Peterson v. W. Am. Ins. Co.*, 336 S.C. 89, 94, 518 S.E.2d 608, 610 (Ct.App.1999). "In determining whether any triable issues of fact exist, the evidence and all inferences which can be reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party." *Strother v. Lexington County Recreation Comm'n*, 332 S.C. 54, 61, 504 S.E.2d 117, 121 (1998). "On appeal from an order granting summary judgment, the appellate court will review all ambiguities, conclusions, and inferences arising in and from the evidence in a light most favorable to the non-moving party below." *Osborne v. Adams*, 346 S.C. 4, 7, 550 S.E.2d 319, 321 (2001); *accord Williams v. Chesterfield Lumber Co.*, 267 S.C. 607, 610, 230 S.E.2d 447, 448 (1976).

## *LAW/ANALYSIS*

## I. LIABILITY FOR PLEDGE AND AS GUARANTOR

### A. Breach of Guaranty Agreement

Appellant contends the trial court erred in granting summary judgment to Regions Banks on the issue of her liability for payment on the second loan. She maintains there is a genuine issue of material fact as to whether she is liable under the guaranty agreements due to the irregularities claimed and her lack of an understanding that her liability was unlimited.

In order to find Appellant breached a contract with Regions Bank, a contract must first be found to exist. A contract is an obligation which arises from actual agreement of the parties manifested by words, oral or written, or by conduct. *Prescott v. Farmers Tel. Co-op., Inc.*, 335 S.C. 330, 335, 516 S.E.2d 923, 925 (1999); *Roberts v. Gaskins*, 327 S.C. 478, 483, 486 S.E.2d 771, 773 (Ct.App.1997). "A contract exists where there is an agreement between two or more persons upon sufficient consideration either to do or not to do a

particular act." *Benya v. Gamble*, 282 S.C. 624, 628, 321 S.E.2d 57, 60 (Ct.App.1984). "Stated another way, there must be an offer and an acceptance accompanied by valuable consideration." *Roberts*, 327 S.C. at 483, 486 S.E.2d at 773; *Carolina Amusement Co., Inc. v. Connecticut Nat'l Life Ins. Co.*, 313 S.C. 215, 220, 437 S.E.2d 122, 125 (Ct.App.1993). The issue in this case involves Appellant's acceptance of the contract.

Appellant has acknowledged that two of the guaranty agreements contain her signature: the May 30 and July 17 agreements. The May 30 Guaranty Agreement is incomplete and therefore cannot constitute acceptance. However, the July 17 Guaranty Agreement is complete and purports to bind Appellant to unlimited liability for Martin Coleman's present and future indebtedness:

> The liability of the undersigned under this Guaranty Agreement:

> X shall be UNLIMITED as to amount and the undersigned shall be liable for all debts of the borrower.

The Guaranty Agreement specifies what debt is being guaranteed:

> NOW, THEREFORE, in consideration of such credit extended and/or to be extended in its discretion by the Bank to the Borrower (whether to the same, greater, or lesser extent than the limit of this guaranty), the undersigned ... who executes this guaranty agreement to induce the Bank to extend credit to the Borrower, hereby unconditionally guarantees to the Bank ... the punctual payment when due, with such interest as may accrue thereon either before or after any maturity(ies) thereof, of ALL DEBTS AND OBLIGATIONS OF THE BORROWER OR OF THE BORROWER[S] AND ANY OTHER PARTY OR PARTIES, NOW EXISTING OR HEREAFTER ARISING, whether created directly or acquired by endorsement, assignment or otherwise, whether absolute or contingent, secured or unsecured, due or not due, including but not being limited to notes, checks, drafts, bills of exchange, credits and advances, all of which are hereinafter referred to as "debts of the Borrower."

In addition, Appellant waived certain rights by signing the Guaranty:

The undersigned expressly waives: (a) notice of acceptance of this guaranty and of all extensions of credit to the Borrower; (b) presentment and demand for payment of any of the debts of the Borrower; (c) protest and notice of dishonor or of default to the undersigned or to any other party with respect to any of the debts of the Borrower or with respect to any security therefore; (d) all other notices to which the undersigned might otherwise be entitled; and (e) demand for payment under this guaranty.

■ Appellant attempts to argue for the first time on appeal that the July 17 agreement was incomplete at the time it was signed. It is axiomatic that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review. *Wilder Corp. v. Wilke*, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998); *accord Harris v. Bennett*, 332 S.C. 238, 245, 503 S.E.2d 782, 786 (Ct.App.1998). Additionally, Appellant has presented no evidence that the contract, which appears in the record completed, was actually signed before it was completed.

Finally, Appellant insists that while her signature may be on the Guaranty Agreement, she never intended to enter into an agreement for unlimited liability. She was queried: "Do you recall being asked to personally guarantee that if they defaulted on one or more of the loans they had that you would pay if they defaulted." She answered: "No." As noted above, Appellant provides no legal authority for why her lack of understanding would provide a means to rescind an otherwise valid contract.

■ Even if her contention is assumed to be one of unilateral mistake, it is unavailing absent proof of fraud, deceit, misrepresentation, concealment, or imposition of the party opposed to rescission. *See Truck South, Inc. v. Patel*, 339 S.C. 40, 49, 528 S.E.2d 424, 429 (2000) ("Unilateral mistake is not by itself grounds for rescinding the contract unless the mistake has been induced by fraud, deceit, misrepresentation, concealment, or imposition of the party opposed to rescission, without negligence on the part of the party claiming rescis-

sion, or where mistake is accompanied by very strong and extraordinary circumstances which would make it a great wrong to enforce the agreement."); *Alderman v. Bivin*, 233 S.C. 545, 552, 106 S.E.2d 385, 389 (1958) ("A contract may be reformed or rescinded ... where the mistake is not mutual, unilateral, and has been induced by the fraud, deceit, misrepresentation, concealment, or imposition in any form of the party opposed in interest to the reformation or rescission, without negligence on the part of the party claiming the right...."). Here, she fails to present evidence of her lack of understanding as the basis for the unilateral mistake. Additionally, Appellant averred that she did not read the documents placed in front of her:

Q. Did you look at the form where it's check marked by unlimited?

A. That's right.

Q. Did you ask anybody any questions as to why the check mark was there?

A. I never looked at it. I have people come in the store and buy boats, and they never read it.

Q. They never read any of the forms?

A. They never read it.

Q. Is it fair to say that when you went to [Regions Bank] and signed any of the documents that you signed that you didn't take the time to study them?

A. No I didn't. I just trusted Richard [Furman].

Q. And did you ever ask Mr. Furman what any of them meant?

A. No.

A person who signs a contract or other written document cannot avoid the effect of the document by claiming he did not read it. *Sims v. Tyler*, 276 S.C. 640, 643, 281 S.E.2d 229, 230 (1981); *Evans v. State Farm Mut. Auto. Ins. Co.*, 269 S.C. 584, 587, 239 S.E.2d 76, 77 (1977). A person signing a document is responsible for reading the document and making sure of its contents. Every contracting party owes a duty to the other party to the contract and to the public to learn the contents of a document before he signs it. *Burwell v. South Carolina Nat'l Bank*, 288 S.C. 34, 39, 340

S.E.2d 786, 789 (1986); *Sanders v. Allis Chalmers Mfg. Co.*, 237 S.C. 133, 139–40, 115 S.E.2d 793, 796 (1960); *Stanley Smith & Sons v. D.M.R. Inc.*, 307 S.C. 413, 417, 415 S.E.2d 428, 430 (Ct.App.1992). One who signs a written instrument has the duty to exercise reasonable care to protect himself. *Maw v. McAlister*, 252 S.C. 280, 285, 166 S.E.2d 203, 205 (1969); *Evans*, 269 S.C. at 587, 239 S.E.2d at 77; *DeHart v. Dodge City of Spartanburg*, 311 S.C. 135, 139, 427 S.E.2d 720, 722 (Ct.App.1993). "The law does not impose a duty on the bank to explain to an individual what he could learn from simply reading the document." *Citizens & S. Nat'l Bank of South Carolina v. Lanford*, 313 S.C. 540, 545, 443 S.E.2d 549, 551 (1994).

 This rule is subject to the exception that if the party is ignorant and unwary, his failure to read the document may be excused. *Burwell*, 288 S.C. at 40, 340 S.E.2d at 789; *Thomas v. Am. Workmen*, 197 S.C. 178, 182, 14 S.E.2d 886, 887 (1941); *Austin v. Indep. Life & Accident Ins. Co.*, 296 S.C. 156, 160, 370 S.E.2d 918, 921 (Ct.App.1988). However, our court very strictly construes this exception. *Burwell*, 288 S.C. at 40, 340 S.E.2d at 789. In determining whether a party can be classified as ignorant and unwary, an individual's education, business experience and intelligence are all considered. *Burwell*, 288 S.C. at 40, 340 S.E.2d at 789–90; *Thomas*, 197 S.C. at 182, 14 S.E.2d at 888; *Austin*, 296 S.C. at 160, 370 S.E.2d at 921.

Adverting to Appellant's education, business experience and intelligence, we refute any attempt to classify her as ignorant and unwary. Appellant has loaned money and co-signed loans for her son in the past. She has been involved in the operations of a business. Furthermore, the literature advertising her son's businesses lists her as having over thirty years experience in the marine business. Appellant does not fall into this narrow exception; and therefore, she cannot avoid the effect of the Guaranty Agreement by claiming she did not read it.

Finally, Appellant made payments on the notes. The use of loan numbers on her checks indicated she paid on more than one loan. The following colloquy elucidates her knowledge of the second loan:

Q. Is it fair to say that somehow by putting that number on those checks you knew there was another loan?

A. I guess so.

. . . .

Q. You've got more than one loan number on your checks?

A. Oh, Yeah, I'm sure.

Q. When you put those on there, did you understand there was more than one loan?

A. I guess I did, there was more than one loan.

We agree with the trial court that the documents are unambiguous and clearly obligate Appellant to pay any sums due under the second loan and its renewals to Martin Coleman. She has failed to provide any evidence indicating the contract should be rescinded and has not proven her lack of understanding warranting rescission. The trial court correctly concluded Appellant signed the Guaranty Agreement and was bound to pay the balance due on the second loan.

### B. Pledge of Certificate of Deposit[3]

### 1. Intent to Pledge CD as Collateral

■ Appellant argues she never signed the hypothecation agreement and therefore, never assigned her CD to be used by Joe Schmauch as collateral for the first loan to Martin Coleman. She further insists Regions Bank had no right to liquidate the CD because it had not perfected its security interest. We disagree.

First, Appellant asserts she never pledged her CD as collateral because she never signed the hypothecation agreement. During her deposition, she indicated the signature on the hypothecation agreement was not hers. She also introduced the testimony of Dawn Edwards, who was hired as an expert in handwriting analysis:

3. Appellant maintains the trial court erred in granting summary judgment regarding her liability on the first loan because Regions Bank never had a security interest in the CD and therefore, had no right to the proceeds. She also contends the trial court erred in granting Respondents' summary judgment on her counterclaim and third-party action for conversion of the CD and interest. Because these claims relate to the same facts, they will be addressed together.

If Ms. Schmauch was not impaired and there was not any other physical or medical or use of medicines or anything of that nature, given the 45 documents that I've looked at that should show her natural variation in writing, yes, I'd say that there would be more reason to believe that it was not her genuine signature, if the other factors could be eliminated.

Edwards professed that she briefly examined the signatures.

Additionally in her report, Edwards conclusively determines several signatures are those of Appellant, including the ones on the May 30 and July 17 Guaranty Agreements. However, regarding the hypothecation agreement, she writes: "A definite determination is precluded regarding the . . . names."

We find, even if there is sufficient evidence that a jury could consider the signature on the hypothecation agreement a forgery, Appellant admitted (1) she pledged her CD; (2) she intended to pledge her CD so Joe Schmauch could get the $100,000.00 loan; and (3) she signed papers to pledge her CD. Specifically, she testified:

Q. When you went to [Regions Bank] with your son in connection with the $100,000 loan, did you sign an agreement agreeing to pledge your certificate of deposit?

A. Yes, I did.

. . . .

A. I signed something.

Q. And you understood that you were putting up your CD for this loan?

A. Right.

Q. And your CD was how much?

A. $100,000.

. . . .

Q. What did you think you were going [to the Bank] for?

A. Well, to use my CD as security in case he didn't pay [the first loan] back.

. . . .

Q. Did you think that you had to guarantee the loan?

A. If he didn't pay it.

Q. And how did you understand that you would have to do that if he didn't pay it?

A. Give him my CD, I guess.

Appellant admitted not reading the papers placed in front of her when she went to the bank to pledge her CD.

Based upon her testimony, it is clear she intended to and did in fact pledge her CD as collateral for the first loan. She admitted signing papers in order to pledge her CD. The trial court correctly decided she pledged her CD as collateral for the loan, and when the loan was not repaid, Regions Bank had the right to collect payment.

## 2. Conversion

 The South Carolina Supreme Court discussed conversion in *Crane v. Citicorp Nat'l Servs., Inc.*, 313 S.C. 70, 437 S.E.2d 50 (1993):

> Conversion is the unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of the condition or the exclusion of the owner's rights. To establish the tort of conversion, it is essential that the plaintiff establish either title to or right to the possession of the personal property.

*Id.* at 73, 437 S.E.2d at 52 (internal citations omitted). Conversion may arise by some illegal use or misuse, or by illegal detention of another's personal property. *Owens v. Andrews Bank & Trust Co.*, 265 S.C. 490, 496, 220 S.E.2d 116, 119 (1975); *Castell v. Stephenson Fin. Co.*, 244 S.C. 45, 50–51, 135 S.E.2d 311, 313 (1964). Conversion is a wrongful act which emanates by either a wrongful taking or wrongful detention. *Castell*, 244 S.C. at 50–51, 135 S.E.2d at 313; *Kirby v. Horne Motor Co.*, 295 S.C. 7, 11, 366 S.E.2d 259, 261 (Ct.App.1988). Apodictically, Appellant must demonstrate she had the right to possess the CD at the time Regions Bank liquidated it to satisfy the loan. As we have recognized she pledged the CD as collateral, she did not have the right to possession. An action for conversion may not lie.

 Appellant's contention that Regions Bank failed to perfect the security interest is also without merit. The CD was properly pledged. As such, the CD was in the possession of the Bank, and therefore, the security interest was perfected

under S.C.Code Ann. section 36–9–313(a) (Supp.2002) ("[A] secured party may perfect a security interest in negotiable documents, goods, instruments, money, or tangible chattel paper by taking possession of the collateral.").

The trial court correctly concluded Appellant pledged her CD as collateral on the first loan. Additionally, Regions Bank had a right to liquidate the CD once the balance on the first loan was due and payable. Finally, Respondents are not liable for conversion, as Appellant had no right to possess the CD at the time of Regions Bank's assumption of the CD.

## II. NEGLIGENCE

Appellant declares the trial court erred in granting summary judgment to Respondents on her negligence claim. She asserts Respondents owed her a duty of care because she was particularly vulnerable in this situation and dependent on the bank for guidance. She also maintains the bank holds "an exalted public position and an extra measure of trust is given to the Bank" in the proper execution of loan documents.

Negligence is the breach of a duty of care owed to the plaintiff by the defendant. *Bell v. Atl. Coast Line R.R. Co.*, 202 S.C. 160, 181, 24 S.E.2d 177, 186 (1943); *Crawford v. Atl. Coast Line R.R. Co.*, 179 S.C. 264, 270, 184 S.E. 569, 571 (1936). To state a cause of action for negligence, the plaintiff must allege facts which demonstrate: (1) a duty of care owed by the defendant; (2) a breach of that duty by negligent act or omission; and (3) resulting in damages to the plaintiff; and (4) the damages proximately resulted from the breach of duty. *Thomasko v. Poole*, 349 S.C. 7, 11, 561 S.E.2d 597, 599 (2002); *Kleckley v. Northwestern Nat'l Cas. Co.*, 338 S.C. 131, 138, 526 S.E.2d 218, 221 (2000); *Bergstrom v. Palmetto Health Alliance*, 352 S.C. 221, 229, 573 S.E.2d 805, 808–09 (Ct.App.2002). In determining whether a particular act is negligent, the test used is what would a person of ordinary reason and prudence do under those circumstances at that time and place. *See Spahn v. Town of Port Royal*, 326 S.C. 632, 637, 486 S.E.2d 507, 510 (Ct.App.1997) (holding where motorist is suddenly placed in an emergency situation, through no fault of his own, and is compelled to act instantly to avoid a collision, he is not negligent if he makes a choice that a person of ordinary

judgment might make if placed in same emergency situation). The issue is what, if any, duty a bank owes a customer in the regular course of its business.

■ In *Citizens & S. Nat'l Bank of South Carolina v. Lanford*, 313 S.C. 540, 443 S.E.2d 549 (1994), the supreme court held the bank did not owe a duty to tell the guarantor that his liability was for the entire loan amount. The court explicated: "The law does not impose a duty on the bank to explain to an individual what [she] could learn from simply reading the document." *Id.* at 545, 443 S.E.2d at 551. Appellant's claim that the bank was negligent in not ensuring she understood her liability is equally unavailing.

■ Next, Appellant claims Respondents were negligent because they failed to require and ensure documents were properly completed and to follow banking procedures for completing the documents. Again, if Appellant read the May 30 Guaranty, she would know it was incomplete. In any event, her liability is based on the July 17 Guaranty, which was properly completed. Appellant could not prove how the deficiency to complete the documents proximately caused any of her alleged injuries.

■ Appellant contends Respondents had a duty to advise her about the financial condition of Martin Coleman. However, in *PPG Indus., Inc. v. Orangeburg Paint & Decorating Ctr.*, 297 S.C. 176, 375 S.E.2d 331 (Ct.App.1988), this court found no obligation to notify the guarantor of additional extensions of credit where the guaranty was continuing and the guarantor waived the right to notice. This is precisely the situation at hand. Appellant signed an unlimited guaranty for all current and future debts of Martin Coleman. She agreed to waive all notices to which she would otherwise be entitled. We find there was no duty to apprise Appellant of Martin Coleman's obligations or the renewal of the loans.

Appellant cites *Jacques v. First Nat'l Bank of Maryland*, 307 Md. 527, 515 A.2d 756 (1986) in support of her contention that Respondents owed her a duty of care. It involves a situation where the bank erroneously told the plaintiffs they qualified for financing when they did not qualify. The plaintiffs were required to obtain financing at a higher rate. The

court ruled, under the particular facts of the case, the bank owed plaintiffs a duty of care in processing the application. Even though the court relied upon the fact that the bank holds a special position, this was in terms of processing and approving financing. The case did not establish an overall duty of care between a bank and its customers.

Appellant claims that she is in a vulnerable position and is dependent on the Bank for guidance. However, she was involved in the operation of a business and as part of the literature advertising Joe Schmauch's businesses, she is listed as having over thirty years experience in the marine business. Additionally, she had loaned money to her son in the past and had guaranteed other loans. Veritably, she was not in a vulnerable position, and the bank owed her no special duty of care.

### III. BREACH OF FIDUCIARY DUTY

Appellant argues there was a fiduciary relationship between Respondents and herself. She claims she placed her trust in the Bank regarding her CD and also relied on Furman for advice and information regarding her pledge of her CD and the guaranty of the second loan. We disagree and find no fiduciary relationship existed in this case.

A fiduciary relationship is founded on the trust and confidence reposed by one person in the integrity and fidelity of another. *Steele v. Victory Sav. Bank*, 295 S.C. 290, 293, 368 S.E.2d 91, 93 (Ct.App.1988). "A fiduciary relationship exists when one reposes special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing confidence." *O'Shea v. Lesser*, 308 S.C. 10, 15, 416 S.E.2d 629, 631 (1992); *Island Car Wash, Inc. v. Norris*, 292 S.C. 595, 599, 358 S.E.2d 150, 152 (Ct.App.1987). A relationship must be more than casual to equal a fiduciary relationship. *Steele v. Victory Sav. Bank*, 295 S.C. 290, 293, 368 S.E.2d 91, 93 (Ct.App.1988).

As a general rule, a fiduciary relationship cannot be established by the unilateral action of one party. *Brown v. Pearson*, 326 S.C. 409, 423, 483 S.E.2d 477, 484 (Ct.App.1997);

*Steele,* 295 S.C. at 295, 368 S.E.2d at 94. The other party must have actually accepted or induced the confidence placed in him. *Id.*

 South Carolina holds the normal relationship between a bank and its customer is one of creditor-debtor and not fiduciary in nature. *Burwell v. South Carolina Nat'l Bank,* 288 S.C. 34, 40, 340 S.E.2d 786, 790 (1986); *Owens v. Andrews Bank & Trust Co.,* 265 S.C. 490, 497, 220 S.E.2d 116, 119 (Ct.App.1975); *Johnson v. Serv. Mgmt., Inc.,* 319 S.C. 165, 167–68, 459 S.E.2d 900, 902 (Ct.App.1995). However, a bank may be held to a fiduciary duty if it undertakes to advise a depositor as part of services the bank offers. *Burwell,* 288 S.C. at 40, 340 S.E.2d at 790; *Rush v. South Carolina Nat'l Bank,* 288 S.C. 560, 562, 343 S.E.2d 667, 668 (Ct.App.1986). Such a relationship charges the bank with a duty to disclose material facts that may affect its customer's interests. *Burwell,* 288 S.C. at 40–41, 340 S.E.2d at 790. Yet, no fiduciary relationship between a bank and its depositor exists when the bank is unaware of any special trust reposed in it. *Id.; Steele v. Victory Sav. Bank,* 295 S.C. 290, 294, 368 S.E.2d 91, 93 (Ct.App.1988).

 There is no evidence in this case that Appellant placed a special trust in Furman or Regions Bank. She was merely a depositor. She testified that she relied on no one before pledging her CD. She admitted never asking questions about the guaranty or any documents that she signed. Appellant has not demonstrated that Furman or anyone with Regions Bank undertook to advise her as part of a service offered by the bank. Indubitably, no fiduciary relationship was created in this case.

## IV. FRAUD

Appellant asserts Respondents committed fraud by withholding information or providing her false information. She argues Respondents committed fraud by: (1) continuing to make loans based upon Appellant's ability to pay with the intention to only collect from Appellant; (2) failing to inform Appellant of Martin Coleman's financial condition; and (3) failing to inform her that her liability was unlimited. We

disagree. There is no evidence to establish Respondents committed fraud.

Fraud is an intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to her or to surrender a legal right. Black's Law Dictionary 660 (6th ed.1990). In order to prove fraud, the following elements must be shown: (1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury. *First State Sav. & Loan v. Phelps*, 299 S.C. 441, 446–47, 385 S.E.2d 821, 824 (1989); *Moorhead v. First Piedmont Bank & Trust*, 273 S.C. 356, 359, 256 S.E.2d 414, 416 (1979); *Kiriakides v. Atlas Food Sys. & Servs., Inc.*, 338 S.C. 572, 586, 527 S.E.2d 371, 378 (Ct.App.2000); *Ardis v. Cox*, 314 S.C. 512, 515, 431 S.E.2d 267, 269 (Ct.App.1993). Each and every one of these elements must be proven by clear, cogent, and convincing evidence. *First State Sav. & Loan*, 299 S.C. at 447, 385 S.E.2d at 824; *Lundy v. Palmetto State Life Ins. Co.*, 256 S.C. 506, 510, 183 S.E.2d 335, 337 (1971). The right to rely must be determined in light of the plaintiff's duty to use reasonable prudence and diligence under the circumstances in identifying the truth with respect to the representations made to him. *Florentine Corp., Inc. v. PEDA I, Inc.*, 287 S.C. 382, 386, 339 S.E.2d 112, 114 (1985). Moreover, there is no right to rely, as required to establish fraud, where there is no confidential or fiduciary relationship and there is an arm's length transaction between mature, educated people. This is especially true in circumstances where one should have utilized precaution and protection to safeguard his interests. *Florentine Corp., Inc.*, 287 S.C. at 386, 339 S.E.2d at 114; *Parks v. Morris Homes Corp.*, 245 S.C. 461, 467, 141 S.E.2d 129, 132 (1965) (holding a party has a duty to exercise reasonable care to protect himself or herself against fraud by reading a contract before he signs it); *Outlaw v. Calhoun Life Ins. Co.*, 236 S.C. 272, 276, 113 S.E.2d 817, 819 (1960) (stating one cannot complain of fraud in misrepresentation of contents of written instrument signed by her when the truth could have been discovered by reading the

instrument). The principle of the right of reliance upon representations is closely bound up with a duty on the part of the plaintiff to use some measure of protection and precaution to safeguard his own interest. *Thomas v. Am. Workmen,* 197 S.C. 178, 182, 14 S.E.2d 886, 888 (1941).

It is largely because the law of fraud requires [a claimant] to prove his ignorance of the falsity of the representation and his right to rely on the falsity that the courts long ago established the rule that ordinarily one cannot complain of fraud in the misrepresentation of the contents of a written instrument signed by him when the truth could have been ascertained by reading the instrument, and that one entering into a written contract must read it and avail himself of every reasonable opportunity to understand its content and meaning.

*PPG Indus., Inc. v. Orangeburg Paint & Decorating Ctr., Inc.,* 297 S.C. 176, 180, 375 S.E.2d 331, 333 (Ct.App.1988).

 Appellant could easily have determined for herself the extent of her liability by reading the July 17 Guaranty. It clearly enunciated that she was guaranteeing all debts, present and future, and that her liability was unlimited. Appellant now cannot complain because the extent of her liability was not explained to her by Respondents.

Additionally in the Guaranty, Appellant waived notice of default by Martin Coleman on the debts. She agreed to payment whether or not demand was made of Martin Coleman. Appellant made payments on the notes, as evidenced by the checks entered into the record indicating multiple loan numbers. She knew Martin Coleman had not made all payments, and she made the payments when Martin Coleman defaulted.

 Finally, Appellant cannot complain that Respondents did not inform her of Martin Coleman's financial condition. Non-disclosure is fraudulent when there is a duty to speak. *Manning v. Dial,* 271 S.C. 79, 83, 245 S.E.2d 120, 122 (1978). In *Jacobson v. Yaschik,* 249 S.C. 577, 585, 155 S.E.2d 601, 605 (1967), the court announced the requirements for having a duty to speak:

The duty to disclose may be reduced to three distinct classes: (1) where it arises from a preexisting definite

fiduciary relation between the parties; (2) where one party expressly reposes a trust and confidence in the other with reference to the particular transaction in question, or else from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is necessarily implied; (3) where the very contract or transaction itself, in its essential nature, is intrinsically fiduciary and necessarily calls for perfect good faith and full disclosure without regard to any particular intention of the parties.

Luculently, there are no fiduciary relationship and no expressed repose of trust between the parties. Additionally, Appellant could have easily discerned the financial condition of Martin Coleman by asking her son, with whom she had quite an involved financial relationship. Appellant was required to put forth her collateral in order for Martin Coleman to obtain the first loan. She was required to make payments on both the first and second loans because Martin Coleman did not make the payments. We do not see how Respondents can be required to inform her of the financial condition of the company when she could easily have obtained the information herself.

We hold Appellant had the opportunity to read the documents she signed, and that in not doing so failed to exercise reasonable diligence in protecting her own interest. She had every opportunity to determine the financial condition of Martin Coleman by asking her son. Finally, according to the Guaranty, Respondents had every right to seek payment from Appellant without proceeding or issuing a demand against Martin Coleman.

## V. EQUITABLE ESTOPPEL

Appellant contends Respondents were estopped from collecting payment from her because they did not provide her with information regarding the extent of her liability and she believed she had limited liability. We find her claim to be without merit.

Elements of equitable estoppel as to the party estopped are: (1) conduct by the party estopped which amounts to a false representation or concealment of material facts; (2) the

intention that such conduct shall be acted upon by the other party; and (3) knowledge, actual or constructive, of the true facts. Essential elements of estoppel as related to the party claiming the estoppel are: (1) lack of knowledge and of means of knowledge of truth as to facts in question; (2) reliance upon conduct of the party estopped; and (3) prejudicial change in position.

*Zabinski v. Bright Acres Assocs.*, 346 S.C. 580, 589, 553 S.E.2d 110, 114 (2001) (internal citations omitted).

Application of equitable estoppel does not require an intentional misrepresentation. It is sufficient if the plaintiff reasonably relied upon the words or conduct of the defendant in allowing the limitations period to expire. *Dillon County Sch. Dist. No. Two v. Lewis Sheet Metal Works, Inc.*, 286 S.C. 207, 218–19, 332 S.E.2d 555, 561 (Ct.App.1985) (*overruled on other ground by Atlas Food Sys. v. Crane Nat'l Vendors*, 319 S.C. 556, 462 S.E.2d 858 (1995)); *Brown v. Pearson*, 326 S.C. 409, 419, 483 S.E.2d 477, 482 (Ct.App.1997). "Silence, when it is intended, or when it has the effect of misleading a party, may operate as equitable estoppel." *S. Dev. Land & Golf Co. v. South Carolina Pub. Serv. Auth.*, 311 S.C. 29, 33, 426 S.E.2d 748, 751 (1993) (citation omitted).

Whether the actions lulled the plaintiff into "a false sense of security" is usually a question of fact. *Dillon County Sch. Dist. No. Two*, 286 S.C. at 219, 332 S.E.2d at 561. However, summary judgment is proper where there is no evidence of conduct warranting estoppel. *Vines v. Self Mem'l Hosp.*, 314 S.C. 305, 309, 443 S.E.2d 909, 911 (1994). "One with knowledge of the truth or the means by which with reasonable diligence he could acquire knowledge cannot claim to have been mis[led]." *S. Dev. Land & Golf Co.*, 311 S.C. at 34, 426 S.E.2d at 751.

In the instant case, Appellant was able to ascertain the true nature of her liability for payment on Martin Coleman's debt by reading the July 17 Guaranty Agreement. In failing to read the agreement or seek to understand the nature of her liability within the agreement, she cannot claim to have been misled by Respondents' silence regarding her liability or any false statements regarding her liability. The trial court

was correct in granting Respondents summary judgment on Appellant's equitable estoppel claim.

## CONCLUSION

We find Appellant intended to and did pledge her CD as collateral for the first loan to Martin Coleman. Regions Bank and Appellant had a properly signed and completed Guaranty Agreement on July 17, 1996, providing for unlimited liability for all current and future debts of Martin Coleman. The trial court properly granted summary judgment to Regions Bank for the amount due and payable on its collection action. Next, we find Appellant did not read the documents she signed, and if she had read the documents, she would have been apprised of the nature of her liability and the waiver of all notices due to her. The trial court was correct in granting summary judgment to Respondents on Appellant's counterclaims and third-party causes of action for negligence, breach of fiduciary duty, conversion, fraud, and equitable estoppel. Accordingly, the decision of the trial court is

**AFFIRMED.**

CONNOR and HUFF, JJ., concur.